UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GARY GIESELMAN,                            )
                                           )
        Plaintiff,                         )
                                           )
    vs.                                    )          Case No. 4:10CV1619 JAR
                                           )
VALERIA WILSON JACKSON, et al.,            )
                                           )
        Defendants.                        )

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants' Motion for Summary Judgment (ECF

134).  This matter is fully briefed and are ready for disposition.

## BACKGROUND

For purposes of this Motion, Defendants[1] assume as true all of Plaintiff Gary J. Gieselman's

("Plaintiff") allegations regarding the underlying events at the Washington County Jail that occurred

on September 29, 2005.   (Memorandum in Support of Summary Judgment Motion

("Memorandum"), ECF No. 135, p. 1; Reply Memorandum in Support of Motion for Summary

Judgment ("Reply"), ECF No. 145, p. 2).  Plaintiff brought a claim against Washington County and

its employees, which was referred to the Missouri Public Entity Risk Management Fund

("MOPERM").  (Memorandum, p. 2).

---

[1]This Motion is brought on behalf of Defendants Washington County, Valeria Wilson Jackson, Vernon Wilson, Kevin Schroeder, Lance Mason, Shannon Thompson, Michael Hahn, and the Missouri Public Entity Risk Management Fund.  The parties do not dispute that Washington County, Valeria Wilson Jackson, Vernon Wilson, Kevin Schroeder, Lance Mason, Shannon Thompson, Michael Hahn would be covered by a valid release of Washington County, its elected officials and employees.  Rather, the parties dispute whether the release at issue was valid.  This Motion does not apply to defendants Christopher Robert Wallace, Lanny Parks, Rodney Rawlins, and Jason Gullett who were all detainees at the Washington County Jail during the events alleged in the Second Amended Complaint.  See ECF No. 104, ¶¶13-16.

In the summer of 2006, Plaintiff and MOPERM began discussing Plaintiff's allegations and a possible settlement.[2]   Throughout Plaintiff's claim to MOPERM, Plaintiff asserted that Washington County was liable to him for the assault committed by other detainees because Washington County officials instigated and encouraged the assault.  (Statement of Undisputed Material Facts ("SUMF"), ECF No. 135 at pp. 12-14, ¶3). For example, in the first email provided, dated June 20, 2006, Plaintiff specifically claims that Washington County Sheriff Department employees directed detainees to assault him: "i really hope by now you have had some time to review my claim with washington county,mo. wherein i was nearly beat to death by several inmates upon direction and negligence of the washington county sherriffs dept.employees. [sic]"(6/20/06 email, 5:19 p.m.).  Also from the beginning, Plaintiff attempted to settle his claims and avoid litigation.  Plaintiff's initial offer for settling his claims was $189,000.00. (Id.).  In response, MOPERM stated that it was waiting for the report from the investigation of the September 29, 2005 incident and also for copies of Plaintiff's medical records.  (6/22/06 email, 12:49 p.m.; 9/20/06 email; 11:18 a.m.).  Plaintiff acknowledged that he was not an attorney, but contended that he had "10 years of experience in legal research, and [has] read over 200 appellant and supreme court cases" so that he knew "where [his] case [stood], and [knew his] final outcome in time."  (6/22/06 email; 12:43 p.m.).  On September 20, 2005, Plaintiff offered to "take a third off my proposal" to start the negotiations.  (9/20/06 email; 11:11 a.m.).  Plaintiff promised that he would "probably not reject any reasonable offer and i can go ahead and sign off on future responsibility. [sic]" (Id.).  On September 21, 2006, Plaintiff again contacted MOPERM in an effort to settle his case.  (9/21/06 email; 2:28 p.m.).  Plaintiff indicated that he had spoken with an attorney; this attorney contacted

_____

[2]Plaintiff's allegations are preserved in email correspondence between Plaintiff and MOPERM employees.  (SUMF, ¶4).  These emails are attached to Defendants' Motion as Exhibit D.  See ECF No. 134-5.

individuals who verified his claim that "this has happened before, others have been assaulted in there jail at the hands and directions of these employees,these employees were actually compensating these inmates for carrying out these assaults which were ordered by the employees, these inmates were awarded more priveleges,paid in cash placed on there books,given cigaretttes,etc. by these employees who ordered these attacks and assaults [sic]." (Id.). On October 2, 2006, Plaintiff again suggested that MOPERM "make me an offer that is reasonable and we can get this done and over with." (10/2/06 email, 11:58 a.m.). On October 16, 2008, Plaintiff indicated that he was considering filing a "state and federal suit" but noted that "[i]f you had offered a third or fourth of what i proposed i would have settled and we could have gone on with our lives and put this behind us." (10/16/06 email, 8:37 a.m.). On November 6, 2006, Plaintiff inquired why MOPERM would not want to settle his claims for "pennies on the dollar." (11/6/06 email, 10:17 p.m.). Plaintiff indicated that he did not have insurance and needed the money to get proper medical and dental treatment. (Id.). Plaintiff also stated, "i know alot more than you might think i do about this whole matter and incident it goes far beyond one episode and who was involved in all the episodes [sic]." (Id.). On November 21, 2006, Plaintiff offered to settle his claims for $135,000.00 because "Im not in this to make attorneys rich they get a third [sic]." (11/21/06; 11:15 p.m.). On November 27, 2006, Plaintiff asked if MOPERM wanted to make a counter proposal to settle his claims. (11/27/06 email, 2:52 p.m.). Later that day, Plaintiff responded and asked if they could come to an agreement by Friday because "im not out for the money like the attorneys care about [sic]." (11/17/06 email, 9:45 p.m.). On December 29, 2006, Plaintiff emailed MOPERM and asked if it would consider settling the case out of court for the amount of his last proposal, "which is pennies on the dollar[.]" (12/29/06 email, 2:17 p.m.). On January 18, 2007, Plaintiff provided MOPERM with a list of settlements or awards that were allegedly similar to Plaintiff's injuries. (1/18/07 email; 12:43 p.m.). Plaintiff indicated that he would settle his claims "somewhere in the area of [$]150,000.00" (Id.).   On January 19,

2007, MOPERM offered to settle Plaintiff's claims for $5,000.00.  (1/19/07 email; 11:00 a.m.).

Later that day, Plaintiff made the counter offer of $170,000.00 to settle his claims.  (1/19/07 email,

11:43 a.m.).  On January 24, 2007, Plaintiff asked MOPERM to reconsider his counter proposal

based upon his "significant research ... as for settlements and awards with injuries sustained such

as mine, fractured eye socket, torn retina, etc." (1/24/07 email; 11:43 a.m.).  Later that day, Plaintiff

stated that he understood MOPERM's position that it required documentation of future medical

expenses.  (1/24/07 email, 2:41 p.m.).  Plaintiff suggested that he either obtain an estimate for his

future medical reconstructive surgery or that they enter into a structured settlement of a one time

payment plus future medical expenses.  (Id.).  On January 26, 2007, Plaintiff stated that MOPERM

had offered $50,000.00 but that he had said that he would not settle for less than $150,000.00.

(1/26/07 email, 12:52 p.m.).  Plaintiff suggested that MOPERM "meet me somewhere in the

middle[.]" (Id.).  On February 1, 2007, Plaintiff made a counter offer of $89,000.00.  (2/1/07 email,

3:47 p.m.).  On February 2, 2007, MOPERM offered Plaintiff $50,000.00 to settle "any potential

claim you may have against Washington County, its officials and employees." (2/2/07 email, 9:13

a.m.).   MOPERM  stated  that  it  could  not  offer  Plaintiff  more  than  $50,000.00  "without

documentation from a certified physician which indicates the treatment you need and the associated

cost." (Id.).  Later that day, Plaintiff offered to settle for $50,000.00, plus the estimated cost of

repair on his eye, as long as the total did not exceed his counter proposal offer of $89,000.00.

(2/2/07 email, 2:17 p.m.).  On February 2, 2007, Plaintiff asked if it would be possible to issue "a

cashiers check payable to me" because he resolved "this matter quietly and quickly and to me

reasonably fair." (2/3/07 email, 6:12 p.m.).

    After months of negotiating, on February 5, 2007, Plaintiff agreed to settle and signed a

release ("the Release") that provided:

for an in consideration of the sum of **Fifty thousand dollars, ("$50,000.00")**" to "remise, release and forever discharge **Washington County, it's** [sic] **elected officials and employees** ... of and from any and all, and all manner of, actions and causes of action, rights, suits, covenants, contracts, agreements, judgments, claims and demands whatsoever ... arising from and by reason of any and all KNOWN AND UNKNOWN, FORESEEN AND UNFORESEEN bodily and personal injuries or death, damage to property, and the consequences thereof, which heretofore have been, and which hereafter may be sustained by the Undersigned ... from all liability arising out of an occurrence that happened on or about the **29th day of September 29, 2005**, [sic] at or near the Washington County Jail, Potosi, Missouri.

(Release, ECF Nos. 134-2, 134-3)(emphasis in original).  MOPERM made the check for $50,000.00 payable to Plaintiff.  (ECF No. 134-4).  Plaintiff cashed the check the same day he signed the Release, February 5, 2007.  (ECF No. 134-4; SUMF, ¶7).  MOPERM has utilized this method of settling claims made against member entities and their officials and employees for hundreds, if not thousands, of claims.  (SUMF, ¶9).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The substantive law determines which facts are critical and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Only disputes over facts that might affect the outcome will properly preclude summary judgment.  Id.  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

A moving party always bears the burden of informing the Court of the basis of its motion.  Celotex Corp., 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material

fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); <u>Anderson</u>, 477

U.S. at 248.  The nonmoving party may not rest upon mere allegations or denials of his pleading.

<u>Anderson</u>, 477 U.S. at 258.  "[A] properly supported motion for summary judgment is not defeated

by self-serving affidavits."  <u>Conolly v. Clark</u>, 457 F.3d 872, 876 (8th Cir. 2006) (citing <u>Davidson</u>

<u>& Assocs. v. Jung</u>, 422 F.3d 630, 638 (8th Cir. 2005)).

In passing on a motion for summary judgment, the Court must view the facts in the light

most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor.

<u>Celotex Corp.</u>, 477 U.S. at 331, n.2.  The Court's function is not to weigh the evidence but to

determine whether there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249. "'Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts

are jury functions, not those of a judge.'"  <u>Torgerson</u>, 643 F.3d at 1042 (quoting <u>Reeves v.</u>

<u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

## DISCUSSION

In his Second Amended Complaint, Plaintiff alleges claims under 28 U.S.C. §1983 for

Violation of his Civil Rights for Unnecessary and Excessive Force against Defendants Jackson,

Wilson, Wallace, Parks, Rawlins, and Gullet (Count I), 28 U.S.C. §1983 for Violation of his Civil

Rights for Failure to Protect against Defendants Jackson, Wilson, Jackson, Hahn, Mason, Thompson,

and Schroeder (Count II), 28 U.S.C. §1983 for Violation of Civil Rights for Conspiracy to Violate

Civil Rights against Defendants Jackson, Wilson, Jackson, Hahn, Schroeder, Mason, Thompson,

Wallace, Parks, Rawlins and Gullett (Count III), 28 U.S.C. §1983 for Violation of his Civil Rights

against Defendant County of Washington, Missouri (Count IV), Assault and Battery against Jackson

and Wilson (Count V), and Fraudulent or Negligent Misrepresentation against MOPERM (Count

VI).

A.      **The Release Bars Plaintiff's Claims**

Plaintiff argues that the Release is void *ab initio* because it does not comport with the requirements of MO.REV.STAT. §432.070. (Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Response"), ECF No. 140, p. 32). Section 432.020 provides that "[n]o county, city, town, village, school township, school district or other municipal corporation shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law, nor unless such contract be made upon a consideration wholly to be performed or executed subsequent to the making of the contract; and such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing." "To be enforceable, a contract with a municipal corporation must comply with the mandatory statutory provisions of section 432.070." Veling v. City of Kansas City, 901 S.W.2d 119, 121 (Mo. Ct. App. 1995)(citing Donovan v. City of Kansas City, 352 Mo. 430, 175 S.W.2d 874, 881-82 (Mo. banc 1943)).

Defendants first argue that the requirements of §432.070 do not apply because MOPERM is not a "county, city, town, village, school township, school district or other municipal corporation." Rather, MOPERM is a statutorily-created "body corporate and politic." §537.700, R.S. MO.

In response, Plaintiff claims that the Release is void because it was not signed by "the parties thereto, or their agents." MO.REV.STAT. §432.070. Plaintiff argues that the Release is invalid because it is with Washington County, not with MOPERM, and Washington County did not sign the Release. (Response, p. 40). In addition, Plaintiff argues that "[t]he fact that nobody signed the Release, except the Plaintiff violated§432.070." (Id., p. 40). Plaintiff argues that Defendants have not provided any evidence that the persons who signed the check were "authorized by law and duly appointed and authorized in writing." §432.070. (Id., p. 44). In essence, Plaintiff states that there is no evidence that Washington County or any of its employees authorized a settlement with Plaintiff. (Id., pp. 44-45).

- 7 -

Plaintiff misunderstands the nature of the Release.  The Release is not an agreement between Plaintiff and Washington County and its employees.  Rather, the Release is an agreement between Plaintiff and MOPERM for the benefit of Washington County's elected officials and employees. Plaintiff cites no case law to support his position that MOPERM must adhere to the requirements of section 432.070 for the Release to bar Plaintiff's claims against the third-party beneficiaries to the Release, Washington County and its employees.  Thus, Plaintiff's arguments that the Release is invalid under MO.REV.STAT. §432.070 because it was not signed by a Washington County agent or employee and that the person who signed the check was not authorized in writing miss the mark. The Release is valid on its face to bar Plaintiff's claims against Washington County and its employees.

Moreover, in the event that MO.REV.STAT. §432.070 applies to MOPERM, Defendants assert that that the settlement substantially complies with the statutory requirements for a valid contract. The settlement has the signatures of both parties: the Release signed by Plaintiff and the $50,000.00 check signed by a MOPERM representative.  Thus, the Release and the check comprise the required writings, with the date made and are subscribed by the parties thereto, as required by section 432.070.

In response, Plaintiff repeatedly states that the two writings provided are "deficient" and do not substantially comply with MO.REV.STAT. §432.070.  (Response, pp. 41-42).  Plaintiff, however, does not provide a basis for his belief that the two writings are deficient, other than comparing the instant action to disparate case law.  See id.[3]  Plaintiff does not address why the check, signed by

---

[3]Plaintiff references Moynihan v. City of Manchester, 265 S.W.3d 350 (Mo. Ct. App. 2008); DeMarr v. Kansas City, Mo., School Dist., 802 S.W. 2d 537 (Mo. Ct. App. 1991); Div. Calvary Brigade v. St. Louis County, 269 S.W. 3d 512 (Mo. Ct. App. 2008).  The facts of those cases, however, differ in a material way from the instant case. In those cases, the courts found that several, often unrelated writings did not constitute a contract.  See Moynihan, 265 S.W. 3d at 357("Because each evidentiary basis upon which the City urges a finding of substantial compliance is deficient,

a MOPERM employee, and the Release together do not constitute a valid release. See Div. Cavalry

Brigade, 269 S.W.3d at 516-17 (citing Sorkin v. City of St. Clair, 800 S.W.2d 817, 818 (Mo. Ct.

App. 1990)("a contract with a municipality need not be contained in one writing"). Plaintiff instead

argues that the Release is ineffective because it was not signed by Washington County officials.

Looking at the Release and the check together, the Court finds that, even if section 432.070 applied

here, the settlement substantially complies with the statute and effectively bars Plaintiff's claims.[4]

**B.      The Release Was Not Procured by Fraud or Misrepresentation**

Missouri recognizes a cause of action for fraudulent inducement. Midwest Printing v. AM

Int'l, 108 F.3d 168, 170 (8th Cir. 1997)(citing R.W. Murray Co. v. Shatterproof Glass Corp., 697

F.2d 818, 830 (8th Cir. 1983)); see also Wages v. Young, 261 S.W.3d 711, 716, n.2 (Mo. Ct. App.

2008)("[A] plaintiff who enters a contract with a defendant may have a cause of action for fraudulent

misrepresentations which induced the plaintiff to enter the contract."). To withstand Defendants'

summary judgment motion, Plaintiff must produce sufficient evidence to satisfy each of the

---

we find that the City's evidence, taken together, does not establish that the written authorization requirement of section 432.070 was satisfied."); DeMarr, 802 S.W.2d at 541-42 ("In the case at bar, the 'contract' DeMarr relies on exists only, if at all, in the form of 'correspondence minutes, other documents and parol evidence.'"; "aggregating a series of separate documents [does not] constitute[] substantial compliance with § 432.070"); Div. Cavalry Brigade, 269 S.W. 3d at 517 (no evidence of substantial compliance with section 432.070 where the County executive did not sign the final lease agreement but, instead, signed an ordinance that authorized him to execute a lease at an undetermined time in the future).

The Court finds the cases cited by Plaintiff to be irrelevant and unpersuasive in this case. Here, there are just two related writings, the Release and the check. Again, the Court does not require evidence that Washington County authorized MOPERM to act on its behalf because the settlement is between Plaintiff and MOPERM, not Washington County. Thus, the Court finds substantial compliance with section 432.070.

[4]Finally, Defendants argue that MOPERM signed the Release, albeit recently. Plaintiff argues that Defendants cannot meet the statute's mandate of "strict compliance" by signing the Release years after the event. (Response, p. 43). The Court does not address whether the recent signature of a MOPERM employee on the Release is sufficient to meet the requirements of section 432.070 because the Court finds a valid Release as of February 5, 2007, when Plaintiff signed the Release.

following elements of a fraud claim: (1) a representation, (2) its falsity, (3) its materiality, (4) the

speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that the

representation should be acted upon by the hearer and in the manner reasonably contemplated, (6)

the hearer's ignorance of the falsity of the representation, (7) the hearer's reliance on the

representation being true, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and

proximate injury. Midwest Printing, 108 F.3d at 170 (citing Emerick v. Mutual Ben. Life Ins. Co.,

756 S.W.2d 513, 519 (Mo. 1988)); see also Cole v. Homier Distrib. Co., 599 F.3d 856, 862 (8th Cir.

2010)(citing Ryann Spencer Group, Inc. v. Assurance Co. of Am., 275 S.W.3d 284, 287 (Mo. Ct.

App. 2008)).  The absence of any element is fatal to a fraud claim. Midwest Printing, 108 F.3d at

170 (citing Emerick, 756 S.W.2d at 519.

Plaintiff asserts that the Release is invalid because he was fraudulently induced to sign the

Release and it is voidable at Plaintiff's option. (Response, p. 32).  Plaintiff asserts that MOPERM

made fraudulent representations to Plaintiff that it could not discuss settlement until it completed

its internal investigations and reports. (Id., pp. 45-46). MOPERM received Detective Smith's report

on January 8, 2007.  (Id., p. 47).  On or around January 24, 2007, a MOPERM employee, Ruth

Stokes, emailed Plaintiff and asked him to call her to discuss his claim.  (Id.).  During the resulting

telephone call, according to Plaintiff, the MOPERM employee informed Plaintiff that the report

regarding his beating did not implicate anyone other than the inmates who were charged after the

incident, i.e., Washington County employees or officials were not involved in his beating.  (Id.).[5]

Plaintiff claims that he relied upon MOPERM's representation that Washington County employees

---

[5]In his affidavit, Plaintiff states that a MOPERM employee made these statements during a telephone call. (ECF No. 140-1).  None of the emails reflect MOPERM's alleged position that only the other inmates were involved in Plaintiff's beating.

were not involved in his beating and that it "was only based on this reliance that Plaintiff accepted the offer and signed a Release."  (Id.).

Defendants argue that Plaintiff cannot demonstrate that he reasonably relied on the representation that Washington County employees or officials were involved in his beating. (Memorandum, pp. 5-6).

A fraudulent misrepresentation claim requires that the plaintiff "actually rely on the misrepresentation to [his] detriment." Noble Sys. Corp. v. Alorica Cent., LLC, 543 F.3d 978, 985 (8th Cir. 2008); Emplrs Mut. Cas. Co. v. Wendland & Utz, Ltd., 351 F.3d 890, 896 (8th Cir. 2003) (to establish the tort of misrepresentation, a plaintiff must show that its reliance on the defendant's statement was reasonable).  Here, the undisputed facts of record establish that Plaintiff could not have reasonably relied on MOPERM's alleged misrepresentation and that he did not rely on the alleged misrepresentation to his detriment.

First, the record is clear that, from the beginning of his contact with MOPERM, Plaintiff believed that Washington County employees ordered his beating by the other detainees.  Plaintiff's belief is evident from his email correspondence.  See 10/2/06 email, 11:58 a.m. ("no matter what your company is thinking the outcome in this matter is going to be the same. what happened is not going to change and that within two hours of me being in the washington county jail ,washinton county jail employees ordered and directed this malacious assault and attack on me." [sic]); 10/31/06 email, 9:46 p.m. ("as i mentioned these assaults at the directives of employees have been taking place before from individual accounts and statements . This was not the first incident." [sic]); 11/6/06 email, 10:17 p.m. ("or is it just my leg being pulled by your company , and for what, who knows, doesnt matter because i know that this incident has been investigated, and who is negligent and responsible, and exactly what happened and why these employees ordered this malacious attack on me..." [sic]); 11/14/06 email, 9:17 a.m. ("This is your companys decision whether to settle this

- 11 -

claim because of wash. county employees negligence and the brutal assault they ordered on me."
[sic]); 12/29/06 email, 2:17 p.m. ("i know that all i have to prove in court is there intentional
negligence and dereliction of duty and violationg my civil rights. not processing me in, dressing me
out in a matter of five minutes, sticking me in a pod that was meant for this and ordering these
inmates to assault me or maybe even kill me. I still do not comprehend why this was done to me on
orders of wash, county employees" [sic]); 1/19/07 email, 3:16 p.m. ("i was malaciously and brutally
beat for no reason at all at the bequest of employees of washington county" [sic]); 1/26/07 email,
12:52 p.m. ("i was attacked and beat severely in the face area by four people , who were ordered by
the employees of wash. co to assault me ..." [sic]). Plaintiff's settlement of his claims cannot be
construed as having been made in reliance on MOPERM's alleged statement that only the other
detainees were involved in Plaintiff's beating. Plaintiff repeatedly states that he knows that
Washington County employees ordered his beating, despite whatever MOPERM discovers. See,
e.g., 10/2/06 email, 11:58 a.m.

        In addition, as noted by Defendants, Plaintiff "would have had no cognizable claim against
the County or its employees arising out of inmates beating him in a jail unless there was some basis
for thinking the employees were responsible for it: either by instigating it or at least by doing
nothing to prevent it though knowing it was happening." (Reply, p. 6). See also Farmer v. Brennan,
511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)(Deliberate indifference requires that
the official know, or should have known, of the risk to an inmate but fail to respond to that risk.);
Williams v. Hooker, No. 4:02CV01250, 2007 U.S. Dist. LEXIS 85943, at *24 (E.D. Mo. Nov. 20,
2007).  Thus, Plaintiff's purported reliance on MOPERM and Washington's alleged representation
that Washington County officials were not involved in his beating would have been unreasonable
because that would have been the only basis for Plaintiff's claim against Defendants.

Moreover, Plaintiff's alleged reliance on MOPERM's statements is unreasonable given his extreme distrust of MOPERM and Washington County employees, as evidenced in his email correspondence.  Even prior to MOPERM's alleged misrepresentation, Plaintiff indicated that Washington County officials would not be truthful and that Detective Smith's report would not be complete or forthcoming.  See 11/6/06 email, 10:17 p.m. ("Why you are being held up by the county or maybe even lied to , by whoever it is your are speaking to down there, i dont know? [sic]");12/29/06 email, 2:17 p.m. ("det, smith knows a lot more than he is telling me" [sic]); 12/30/06 email, 4:57 p.m. ("i know im just another pea in the pod to your company, that you insure many people and have other claims..." [sic]).  Plaintiff's alleged reliance on MOPERM's representation was unreasonable given his clear misgivings regarding the truthfulness of MOPERM and Washington County officials. Accordingly, the Court finds that Plaintiff could not have reasonably relied on MOPERM's alleged statements.

Finally, the record also is clear that Plaintiff did not reasonably rely on MOPERM's statements to his detriment.  From the beginning of his contact with MOPERM, Plaintiff sought to settle his claims for "pennies on the dollar."[6]  Throughout their long and protracted negotiations, Plaintiff encouraged MOPERM to settle his case for a small sum.  See 10/16/06 email, 8:37 a.m. ("I would have settled for minimal, just to put this in the past.  If you had offered a third or fourth of what i proposed i would have settled and we could have gone on with our lives and put this behind us.  You would have saved your company alot of time and money.  you could have offered me pennies on the dollar without any acceptance of responsibility and i could have signed a waiver and

---

[6]Although not an attorney, Plaintiff cannot be said to be an uninformed party.  Plaintiff even researched other cases where the plaintiffs were awarded damages in civil rights claims and compared those injuries and settlements to his claims.  See 1/18/07 email, 12:43 p.m.

non disclosure and we could have been thru." [sic])[7]; 11/6/06 email, 10:17 p.m. ("...i mean i really

dont understand why your company would not want to settle this matter for pennies on the dollar

today ..." [sic]); 11/27/06 email, 9:45 p.m. ("because im not out for the money like the attorneys care

about. lets see if we can come to some agreement."); 12/29/06 email, 2:17 p.m. ("does your

company want to settle this matter out of court, for the amount of my llast proposal.. which is

pennies on the dollar to me and everyone tell me I am foolish to settle for so little ... but if we do this

settlement or should we say whatever legal terminology is needed to keep from having to admit or

sign waiver to not hold your company liable of any future complications... i know this can be done

properly and legally. [sic]"); 12/30/06 email, 4:57 p.m. ("you may not really even care if we settle

for pennies on the dollar"); 1/26/07 email, 12:52 p.m. ("so my final stance my proposal to you is

this, meet me somewhere in the middle you say 50k. i said 150k" [sic]); 2/1/07 email, 3:47 p.m.

("My counter proposal is 89,000.00.").[8]

Thus, even prior to hearing MOPERM's alleged misrepresentations, Plaintiff attempted to

settle his case for "pennies on the dollar."  As of October 16, 2006, Plaintiff indicated that he was

willing to settle his claims for between $47,250 to $63,000. See 6/20/06 email, 5:19 p.m.; 10/16/06

email, 8:37 a.m.; Memorandum, p. 7. Ultimately, Plaintiff settled his case for $50,000.00.  That is,

Plaintiff settled his claims for an amount he deemed acceptable prior to MOPERM's allegedly

fraudulent misrepresentation.  Thus, Plaintiff cannot demonstrate that he reasonably relied on

MOPERM's misrepresentations or that he relied on these representations to his detriment.

---

[7]At that time, Plaintiff's offer to settle his claims was $189,000.  See 6/20/06 email, 5:19 p.m.

[8]MOPERM stated that it could not authorize a settlement above $50,000 because it had no documentation to indicate what future medical treatment Plaintiff would require. See 2/2/07 email, 9:13 a.m. from Ruth Stokes to Plaintiff.  The record does not demonstrate if Plaintiff ever provided any additional documentation of his future medical needs.

The Court grants Defendants' Motion for Summary Judgment because there exists no triable issue of fact.  Counts I - V fail based upon Plaintiff's Release of his claims against the Defendants Washington County, Valeria Wilson Jackson, Vernon Wilson, Kevin Schroeder, Lance Mason, Shannon Thompson, and Michael Hahn.  Likewise, Count VI fails because Plaintiff cannot demonstrate that he reasonably relied to his detriment on any alleged misrepresentation by MOPERM.[9]

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF 134) is **GRANTED**.

An appropriate judgment is filed simultaneously herewith in accordance with the foregoing.

Dated this 3rd day of February, 2012.

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE

---

[9]Having found that there was a valid release of Plaintiff's claims, the Court does not address Defendants' qualified immunity argument.